### VIA v. STATE COMMISSION ON CONSERVATION AND DEVELOPMENT OF STATE OF VIRGINIA.

District Court, W. D. Virginia.
Jan. 12, 1935.

William E. Leahy, of Washington, D. C. (Wm. J. Hughes, Jr., and Sam S. Syme, both of Washington, D. C., on the brief), for plaintiff.

A. C. Carson, of Riverton, Va. (Wm. C. Armstrong, of Front Royal, Va., on the brief), for defendant.

Before PARKER, Circuit Judge, and COLEMAN and PAUL, District Judges.

PAUL, District Judge.

This is a suit in equity, the broad purpose of which is to invalidate the proceedings whereby the defendant, as an agency of the state of Virginia, has undertaken to acquire lands for the formation and establishment of the Shenandoah National Park in the state of Virginia.

A recital of the substance of certain legislative acts involved in the suit may be helpful to an understanding of the questions involved.

By an Act of Congress approved Feb. 21, 1925 (43 Stat. at Large p. 958), the Secretary of the Interior was authorized to determine the boundaries and area of any lands in the Blue Ridge Mountains of Virginia and in the Smoky Mountains of North Carolina and Tennessee, as well as any other lands in the Southern Appalachian Mountains; as in his opinion were suitable for the establishment of national parks. Thereafter, the Secretary of the Interior, having made his report, Congress, by an act approved May 22, 1926 (44 Stat. 616 et seq., title 16, § 403 et seq., USCA), directed that when title to certain lands in the Blue Ridge should be vested in the United States in fee simple, they should be dedicated and set

apart as a public park to be known as the Shenandoah National Park, with the proviso that no such lands should be purchased by the United States, but should be secured by it only by public or private donation. It further authorized the Secretary of the Interior to accept title to the lands referred to and to be purchased with the $1,200,000 already subscribed by the state of Virginia and its citizens and with other contributions for the purchase of such lands.

By an Act of the General Assembly of Virginia, approved March 17, 1926 (Acts 1926, c. 169), there was created, as an agency of the commonwealth, the State Commission on Conservation and Development, with the broad function of conserving and developing the natural resources of the state. Among other things, the commission was authorized to acquire by gift or purchase or by exercise of the power of eminent domain, any areas, properties, or lands of scenic beauty, recreational utility, or historical interest which, in the judgment of the commission, should be preserved and maintained for the use, observation, education, health, and pleasure of the people of Virginia.

The commission was constituted a body corporate with power, in such capacity, to sue and be sued, contract and be contracted with, and to purchase, lease, or otherwise acquire property, real and personal, and to convey the same. It was further provided that all property of the commission should be held in the name of the commission. In addition to the broad and general provisions of the statute creating the commission and outlining its duties and powers, there was contained in it the specific authorization to consider plans and proposals looking to the establishment of a public park in the Blue Ridge area. Lands in such area were authorized to be acquired by gift, purchase, or through condemnation, it being provided that in any such condemnation the proceedings should conform to the provisions of chapter 176 of the Code of Virginia, which was the statute dealing generally with eminent domain. The commission was further granted the power to give and convey to the United States for "national park purposes" title to lands which it might have or thereafter acquire in the Blue Ridge area suitable for a public park (Acts of Assembly of Va. 1926, c. 169, p. 307).

The Act of Congress of May 22, 1926, having been enacted subsequent to the Virginia act just referred to, the Virginia Legislature at its next succeeding session in 1928 enacted what is known as the "National Park Act" (approved March 22, 1928, see Acts of Assembly 1928, c. 371, p. 983). This act refers specifically to the Act of Congress of May 22, 1926, and declares that the lands therein referred to in the Blue Ridge Mountains are specifically designated and set apart as suitable for public park purposes and the State Commission on Conservation and development is "authorized and empowered to acquire title to said lands or any part thereof for such use." Section 3. A description of the lands to be acquired is given by general boundaries, and the commission is vested with the power to condemn all or any part of the lands so described and to acquire title by condemnation or by gift, purchase, or any other lawful means. The act then (section 6) empowers the commission to give and convey to the United States the lands described for use as a public park, and (section 7) the United States is authorized to acquire the lands, and exclusive jurisdiction over said lands is ceded to the United States, subject to certain conditions not here important.

At the same session of the General Assembly of Virginia (1928), it enacted an act known as the "Public Park Condemnation Act" (approved March 23, 1928, Acts of Assembly 1928, c. 410, p. 1036), providing the form and mode of procedure for the condemnation of lands for public park purposes. The act sets out in elaborate detail the steps to be taken to condemn lands for park purposes and directs that any proceedings for such purpose shall be conducted under the provisions of this act, anything contained in any existing statute, law, or rule of procedure to the contrary notwithstanding.

Thereafter in July, 1931, the Commission on Conservation and Development instituted proceedings in the circuit court of Albemarle county, Va., to condemn various parcels of land in that county including the tract owned by the plaintiff. The purpose of acquiring this land was to include it in the area to be conveyed to the United States for the establishment of the Shenandoah National Park.

The proceedings were conducted under the provisions of the act of March 23, 1928, the "Public Park Condemnation Act," and as a result thereof plaintiff's land was appraised at a value of $3,230. An award in this amount was made, and, in December, 1933, the award having been paid into court, a judgment was taken divesting the title of plaintiff in said land, and vesting such title in the commission.

The plaintiff, alleging himself to be a citizen and resident of Pennsylvania, instituted this suit on November 10, 1934, and in his bill, after alleging the invalidity of the proceedings by which the commission purported to acquire his land, sets forth that title to the land is about to be tendered to the Secretary of the Interior by the Commission on Conservation, and that the commission is about to enter on plaintiff's land and eject him therefrom. Jurisdiction of this court is invoked on the ground that this is a suit in equity arising under the Constitution of the United States which is brought to enjoin and restrain the defendant from depriving the plaintiff of his lands and to remove a cloud upon plaintiff's title placed there by the condemnation proceedings. Jurisdiction is also invoked on the ground of diversity of citizenship. The prayer of the bill is that the defendant be enjoined and restrained from entering upon plaintiff's lands and dispossessing him thereof and that the acts of the General Assembly of Virginia approved March 22 and March 23, 1928, respectively, under which the Commission purported to act, be declared unconstitutional, null, and void, and all proceedings had or done pursuant thereto and any cloud which exists upon plaintiff's title to his lands pursuant to the acts of the defendant be removed from plaintiff's title. The alleged imminence of an ejection from the land is the basis of the prayer for an interlocutory injunction.

In his attack upon the validity of the proceedings whereby defendant undertook to acquire this land, the plaintiff relies on contentions which may be summarized as follows:

1. That the Acts of the Virginia Legislature of March 22 and March 23, 1928, are unconstitutional in that they purport to authorize the condemnation of lands, not for a public purpose or need of the state of Virginia, but in order that the state might make a gift thereof to the United States; thereby depriving plaintiff of his right to due process of law and the equal protection of the laws in violation of the Fourteenth Amendment.

2. (a) That the "National Park Condemnation Act" approved March 23, 1928, set up for the acquisition of park lands a new and different procedure in condemnation proceedings from that under the general condemnation statute of Virginia and constituted an arbitrary discrimination against the owners of such lands and was as to the plaintiff a deprivation of due process of law and the equal protection of law within the meaning of the Fourteenth Amendment.

(b) That the "National Park Condemnation Act" is in itself invalid, in that it contains no provision for an offer to purchase lands before the institution of condemnation proceedings and contains no provisions for adequate notice to the landowner of the proceedings. That no offer of purchase was made the plaintiff prior to the condemnation proceedings and no notice of such proceedings was given the plaintiff. That the act itself and the commission's procedure under it constitute as to the plaintiff a deprivation of property without due process of law guaranteed by the Constitution of the state of Virginia and the Constitution of the United States and a denial to him of the equal protection of the laws under said Constitutions (Const. Va. § 11; Const. U. S. Amend. 14, § 1).

The defendant filed its answer on December 1, 1934, in which it first alleges that the facts pleaded in the bill are not sufficient in law to maintain the bill and do not set out a case entitling the plaintiff to the relief prayed for or to any relief. The answer then recites the proceedings taken by the defendant to acquire plaintiff's land under the provisions of the "National Park Act" and the "Public Park Condemnation Act." It denies the alleged invalidity of the legislation under which it proceeded and specifically asserts the constitutionality of these acts and the regularity of its proceedings under them. It asserts that, through these proceedings, it has become vested with title to the land in question and admits that it is the intention of defendant "to institute appropriate proceedings in the Virginia State Courts to recover possession of said tract of land."

At the time of filing its answer, the defendant filed also its motion praying that the court, pursuant to Equity Rule 29 (28 USCA § 723), would on the same date set for hearing the motion for an interlocutory injunction, call up and dispose of the point of law raised by the answer to the effect that the allegations of the bill are not sufficient to entitle it to be maintained. Of this motion the plaintiff had timely notice.

We are of opinion that the prayer for an interlocutory injunction should be denied, and, further, that the bill should be dis-

missed for the reason that it sets forth no facts justifying the granting of equitable relief.

I. The first contention of the plaintiff, and the one upon which he appears to insist more earnestly, raises the question whether a state can acquire, by condemnation, lands deemed suitable for a public park and then convey such lands to the United States to be by the latter maintained and administered as such public park.

The question is obviously one of far-reaching importance involving a constitutional principle which may, in the future, affect various projects of a public nature, and which affects, in the immediate present, the existence not only of the Shenandoah National Park, but also the Great Smoky Mountains National Park, the Mammoth Cave National Park, and possibly other enterprises, the establishment of which has been undertaken under similar terms and by similar proceedings.

In the absence of federal decisions directly in point, the plaintiff, in support of his contentions in this respect, relies upon the case of People ex rel. Trombley v. Humphrey, 23 Mich. 471, 9 Am. Rep. 94, and upon cases thereafter citing and approving the principles there stated. The defendant calls attention to Burt v. Merchants' Ins. Co., 106 Mass. 356, 8 Am. Rep. 339; Gilmer v. Lime Point, 18 Cal. 229; Reddall v. Bryan, 14 Md. 444, 74 Am. Dec. 550; and relies even more strongly upon the cases of Lancey v. King County, 15 Wash. 9, 45 P. 645, 34 L. R. A. 817, and Rudacille v. State Commission, 155 Va. 808, 156 S. E. 829, in which latter case the Supreme Court of Virginia has upheld the constitutionality of the legislation here attacked.

In People ex rel. Trombley v. Humphrey the Legislature of Michigan had authorized the Governor to condemn certain lands for the purpose of conveying them to the United States government for the erection and maintenance of lighthouses thereon. Following the condemnation, the United States refused to accept the land because of the cost, and, in the course of subsequent litigation, Justice Cooley held that the proceedings taken to condemn the land were void. He held, broadly speaking, that the state of Michigan was without power to condemn lands, the proposed use of which was not needful for purposes of the state and was not within the functions of the state, for the purpose of turning the land over to the United States for use in the carrying out of an exclusively federal function. The following quotation from the excellently written opinion appears to sum up the views of the court, and likewise to embody the contention of plaintiff in the instant case: "The eminent domain in any sovereignty exists only for its own purposes; and to furnish machinery to the general government under, and by means of, which it is to appropriate lands for national objects, is not among the ends contemplated in the creation of the state government."

The plaintiff cites the case of Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449, as approving the principles laid down in People ex rel. Trombley v. Humphrey. But an examination of that case shows that any such approval was an indirect one, made in the course of what may fairly be called a dictum. Kohl v. United States is authority for the proposition that the federal government has the power to condemn land for its uses without the consent of the state wherein the land is situated and that the state cannot prescribe the manner in which this power must be exercised. In referring to the fact that the previous nonuse of this power did not disprove its existence, the court calls attention to the fact that although in some instances the states, by virtue of their own right of eminent domain, have condemned lands for use of the national government and been upheld by their courts in so doing, this had been done without denying the right of the United States to act independently. Citing Gilmer v. Lime Point, 18 Cal. 229 and Burt v. Merchants' Ins. Co., 106 Mass. 356, 8 Am. Rep. 339. Stating that the cited cases had decided only that a state could condemn property for use of the federal government, the court asserts that People ex rel. Trombley v. Humphrey held otherwise and, in its opinion, is founded on better reason.

In Darlington v. U. S., 82 Pa. 382, 22 Am. Rep. 766, cited by plaintiff, the right of the state to condemn a site for the erection of a building for a post office, custom house, and federal court was denied on the reasoning of People ex rel. Trombley v. Humphrey.

But the reasoning in these cases is not, in our opinion, applicable to the situation before us. In both People ex rel. Trombley v. Humphrey and Kohl v. United States emphasis is laid upon the separate sovereignties of the states and the United States and there is pointed out their respective functions and duties in our governmental

scheme and that the power of eminent domain may be and should be exercised by each within the field of its own needs.

The decision in People ex rel. Trombley v. Humphrey undoubtedly is based upon the view that the purpose for which the land was condemned was for a federal use only and had no relation to the needs of the state. In answer to the suggestion that the interest of the state in coastwise commerce gave the state an interest in the establishment of lighthouses, the court said: "But the act does not proceed on any theory of state interest. It assumes that the taking is to be for the United States exclusively. It is not necessary for us to consider, therefore, what might be the result were the theory of the act different."

We think there is a marked distinction between these cases and that before us. In the cited cases, the land was undertaken to be condemned by the state to be used for an exclusively federal purpose. It is plain that the operation of a lighthouse, of a post office, or a federal court is exclusively the function of the federal government, and that these activities are not within the powers of the state.

It is conceded that the establishment and maintenance of public parks for the benefit of its citizens is within the powers of the state. See Rindge Co. v. Los Angeles County, 262 U. S. 700, at pages 707, 708, 43 S. Ct. 689, 67 L. Ed. 1186. This has been expressly decided as to the state of Virginia in Rudacille v. State Commission, 155 Va. 808, at page 818, 156 S. E. 829. The power of the national government to own and maintain public parks has, so far as we know, never been questioned. It is true that the great public parks owned and maintained by the national government have heretofore been, in the main, areas set aside from the public domain and not acquired from the states. But if it be within the power of the federal government to own and maintain public parks, we know of no constitutional principle which limits exercise of this power to areas owned by the United States as the result of conquest or discovery and forbids it upon lands acquired from the states for the purpose. That Congress believes, at least, that it has such power is evidenced by the Act of Congress of July 3, 1930 (16 US CA § 443 et seq.), authorizing the acquisition, by condemnation if necessary, of Jamestown Island and other areas as a national monument to be administered by the National Park Service; which project, it may be said, has been carried out.

The plaintiff, not denying the power of the state to establish public parks nor of the United States to maintain public parks, contends that it is beyond the power of a state to establish "national" parks. It may here be said, as was pointed out in Rudacille v. State Commission, supra, that the land here in question could be taken by the state under the Act of March 17, 1926, and that of March 23, 1928, even though the Act of March 22, 1928 (National Park Act), had never been passed. In fact, the petition in the condemnation proceedings, wherein the land was acquired, states that petitioner desires to acquire "for a public park and for public park purposes * * * an area within the Blue Ridge," etc. There is no statement as to a "national park." The power being exercised by the state, as disclosed upon the face of the proceedings, was one of which there could be no question.

And the state having acquired title through the exercise of this unquestioned power that exercise of power would not seem to be invalidated by the fact that the state later ceded the land to the federal government to be by it maintained for the purpose for which it was condemned. It is apparently upon this view that the Supreme Court of North Carolina in Yarborough v. North Carolina Park Commission, 196 N. C. 284, 145 S. E. 563, 569, upheld the validity of similar proceedings whereby lands were acquired for the Great Smoky Mountains National Park, saying: "Under the doctrine of eminent domain, the title may be acquired on behalf of the state and then by legislative and congressional assent it may be transferred to the United States."

And even if it be true that at the time the legislation in question was enacted it was intended and provided that the area to be acquired was to be turned over to the United States for the maintenance of a national park, we do not see that the situation is altered. The plaintiff errs, we think, in the significance and effect which he attributes to the word "national" as applied to the park to be created. It is his contention that "national" parks are maintainable only by the federal government and that therefore the state exercised its power of eminent domain to serve an exclusively federal purpose—contrary to the doctrine of People ex rel. Trombley v. Humphrey. But this overlooks the true principles which govern the

exercise of the power of eminent domain. The power exists, in any state, for the promotion of the safety, convenience, welfare, and happiness of the people of that state. Conceding that the power of eminent domain must be exercised by a state only in connection with some public function of that state, it must also be conceded that the furtherance of the health, pleasure, and recreational facilities of its people is a function of the state. If this be true, and it undoubtedly is, is the right of the state to perform this function, to accomplish this purpose, to be denied because the manner of its accomplishment involves the cession to the federal government of land which the latter agrees to maintain for this purpose? Is the state in the performance of a legitimate function forbidden to accomplish it through such means or agency as it chooses? We think not. And is the purpose to be declared one not for the benefit of the people of Virginia because this benefit may accrue also to the people of other states? Again we think the answer must be in the negative. The healthful pleasure and recreation which comes to the citizens of Virginia through the establishment of this park is not lessened by the fact that citizens of other states may also enjoy these advantages. What the state of Virginia has sought to do is to exercise its sovereign power for the benefit of its citizens in the establishment of a public park, an unquestioned right. And we do not think the exercise of this right is impaired by the fact that at the same time it has agreed with the national government that the latter shall hold title to the park area and administer it for the use of the people of Virginia and those of other states as well.

If the state of Virginia were to retain title and maintain this area as a park, it would undoubtedly be freely open to the citizens of all states who might choose to visit it. Under administration by the state, as under administration by the United States, it would be for the use of the people of the nation—with a greater use in the people of Virginia because of their local residence. As said in the closely similar case of Lancey v. King County, 15 Wash. 9, 45 P. 645, 646, 34 L. R. A. 817: "It is not to be occupied and controlled by government agents, like a fort, but is for everybody's use as a great public highway, and the control by the general government is only to regulate that use for the general good, and it matters little by whom this is done. * * * It is apparent that the character

of the work cannot be essentially altered by its ownership or control. ' * * *"

The last-quoted sentence embodies a statement which, in our opinion, is strongly applicable in the present case.

In Rockaway Pacific Corporation v. Stotesbury et al. (D. C.) 255 F. 345, 352, Judge Rogers, in a concurring opinion, discusses the right of the state of New York to condemn lands to be transferred to the United States for purposes of the public defense. He says in part: "The Legislature of New York has passed an act, and the Governor has signed it, under which, if requested to do so by any officer or agent of the United States duly authorized, the Governor may execute a deed of the land proposed to be taken, transferring title to the government of the United States, to be used for purposes of defense. The validity of the law is not invalidated by such a provision, in view of the fact that the state of New York is entitled to condemn land for its own public defense, and that this land, if it should thereafter be transferred to the United States, will still be used for the defense of the state. If the state were proposing to condemn a site to be used for a post office or a custom house, I should think the court should deny its power to do so, for plainly it would not be a taking for the use of the state, and therefore be beyond its right. But where it is proposed to take property for public defense, I do not see how the right of the state can be successfully challenged on the ground that under certain conditions the property may be transferred to the United States for the defense of the lives and property of the citizens of the state as well as citizens of the United States."

We are not impressed with the argument that there is no guarantee that this land will be used perpetually as a public park, that it will not, in time, be used for something other than a "public use." We cannot attribute bad faith to either the state of Virginia or the United States. We must assume and do assume, that it is the intention of each that this area will be used as a public park and that this intention will be carried out. There are few conditions in this changing world that can be guaranteed to continue for all time. And it is not necessary to the validity of this legislation that there be such guarantee. It is a constantly recurring fact that property once acquired by condemnation outgrows the public use for which it was acquired (sites for schools, courthouses, etc.) and that new locations must be sought

and new buildings constructed. But no authority has recognized the right to question the validity of the original taking because there was no guarantee of perpetual use. To make such a guarantee a condition of condemnation would, in most instances, be as effectual a barrier to the public welfare as to deny in toto the right of eminent domain. If the public need exists at the time of the condemnation, that is sufficient to justify it. What rights the state of Virginia might have if, in future years, the United States should abandon use of the land as a park, is a question not now before us.

■■ II. We are unable to take the view that the condemnation of these lands under the "Public Park Condemnation Act," instead of under the general condemnation act, constituted an arbitrary discrimination against the plaintiff, depriving him of due process and the equal protection of the laws. There can be no doubt that the state, in authorizing the Commission on Conservation to acquire lands for public parks, had a right to prescribe a different form or method of procedure from that under the existing general condemnation statute. If, because of the large number of tracts of land involved or for other reasons, the general statute was believed to be impracticable or awkward of operation, the Legislature had an undoubted right to provide for condemnation by a procedure more conveniently fitted to the nature of the proceedings; provided, of course, that the new statute in itself was not invalid. And the mere fact that its provisions varied from those of the general statute did not render it invalid.

■ Legislation may be limited in its application, but if within the sphere of its operation it affects alike all persons similarly situated, it does not violate the provisions of the Fourteenth Amendment. Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923. As said in Power Company v. Saunders, 274 U. S. 490, at page 493, 47 S. Ct. 678, 679, 71 L. Ed. 1165, referring to the effect of the Fourteenth Amendment: "It does not prevent a state from adjusting its legislation to differences in situation or forbid classification in that connection. * * *" This same question was discussed and clearly settled in Suncrest Lumber Co. v. North Carolina Park Commission (D. C.) 30 F. (2d) 121, at pages 126, 127. We refer to that case and the authorities there cited.

■ It remains then to determine whether the act prescribing the procedure for condemnation of lands for park purposes was itself invalid; whether, as plaintiff contends, it deprived him of property without due process of law and denied him equal protection of the laws, in violation of the Constitution of the United States. It may be here said that in Rudacille v. State Commission, supra, the provisions of the Act of March 23, 1928, were reviewed at length and held not to be in violation of the Constitution of Virginia. The conclusions of the Virginia court in this respect are binding upon us, except possibly in so far as the instant case raises questions not there before the court. See Suncrest Lumber Co. v. North Carolina Park Commission, and cases cited therein.

The respects in which the plaintiff was deprived of due process of law and the equal protection of the laws in violation of the Fourteenth Amendment are alleged to be in the failure of the act to provide for any offer to purchase his lands before the institution of the condemnation proceedings, in its failure to provide for adequate notice to him of the proceedings, and in the failure of defendant to give him any notice.

■ It is well settled that in the absence of a constitutional or statutory provision directing it, an attempt to reach an agreement with the owner for a purchase of property is not a condition precedent to condemnation proceedings. 20 C. J. 892; 10 R. C. L. 204.

"The matter of requiring an attempt to agree rests wholly in the discretion of the legislature, and a statute is not invalid because it does not require it." Lewis on Eminent Domain (1st Ed.) § 301.

■ The question of whether the Act of March 23, 1928, provides for adequate notice to landowners was considered in Rudacille v. State Commission, and we agree with what is there said. Our examination of the act and of the record of the proceedings wherein plaintiff's land was acquired convinces us that the provisions of the statute as to notice are adequate and that they were followed. The statute provides for publication of notice in a newspaper of the county for four successive weeks, and that the notice recites all essential information necessary to attract the attention of the landowners and inform them of the nature of the proceedings and of the lands involved therein. The notice, as published, contained a description by courses and distances of the entire area sought to be taken and listed the names of all persons known or believed to own any part of the lands. The plaintiff

was named in this list and he and all other persons claiming an interest in the lands were notified and warned to appear at a named place and date to present their respective claims or demands. This was all that was necessary. As said in Huling v. Kaw Valley Ry. & Imp. Co., 130 U. S. 559, at page 563, 9 S. Ct. 603, 605, 32 L. Ed. 1045, in a similar situation: "Nor have we any doubt that this form of warning owners of property to appear and defend their interests, where it is subject to demands for public use when authorized by statute, is sufficient to subject the property to the action of the tribunals appointed by proper authority to determine those matters."

It is difficult to believe the assertion of the plaintiff that he had no notice of these proceedings. The plaintiff claims to be a resident of Pennsylvania, but alleges in his bill that for five months of each year, including the years from 1928 to 1934, inclusive, he has resided on the lands in question. Considering that his lands, as well as those of his adjoining neighbors, were involved in this proceeding and that it was a matter of public interest and discussion, it is difficult to believe that he knew nothing of it. However that may be, actual notice was not necessary. The proceeding being in rem, notice by publication was sufficient. And the notice, as published in the newspaper, a copy of which is attached to the bill, shows that the provisions of the statute and the constitutional requirements of due process were fully complied with.

The defendant has been content to rest its rights upon its averment of the constitutionality of the legislation under which it acted and the regularity of its procedure thereunder and has not questioned the power of the court to entertain this suit. With its contentions, we have indicated our agreement. But even were our conclusions otherwise, we would feel compelled to point out that in so far as the bill prays for injunctive relief against ejectment from the land, the plaintiff has an adequate remedy at law through the opportunity to defend any action brought to eject him. See U. S. v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171.

Whether, when viewed as a suit to remove a cloud from title, this is, in reality, a suit against the state of Virginia; and, if so, whether the general authority to be sued, granted in the act creating the commission, is equivalent to consent on the part of the state of Virginia to the present suit, without which consent jurisdiction of this court would be lacking, are questions which we consider it unnecessary to decide, since we are of opinion that the allegations of the bill are without merit in that it sets forth no grounds justifying relief and should be dismissed for this reason.

An order will be entered denying the interlocutory injunction and dismissing the bill.