STATE OF HAWAII *v.* W. TIN YAN, ET AL.

No. 4151.

August 2, 1960.

Tsukiyama, C. J., Marumoto, Wirtz, JJ., Circuit Judge
Jamieson in Place of Cassidy, J., Disqualified
and Circuit Judge McKinley in Place of
Lewis, J., Disqualified.

OPINION OF THE COURT BY WIRTZ, J.

This is an appeal on the following agreed facts.
"TO THE HONORABLE THE CHIEF JUSTICE

AND THE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF HAWAII:

"This is an Appeal from the Judgment of the Circuit Court of the Third Circuit finding for the Territory of Hawaii (then the existing government) in an eminent domain case.

"The parties hereby agree upon the facts hereinafter set forth and hereby appeal the case on point of law.

## "STATEMENT OF FACTS

"The Territory of Hawaii (then the existing government) on July 21, 1949, filed a petition in the Circuit Court of the Third Circuit to condemn certain private lands, including lands belonging to the Appellants, for the purpose of donating the same to the Federal Government as an extension to the existing national park.

"The Petition was amended on December 15, 1952, then on March 27, 1953, and again on October 14, 1958.

"The parcels of land involved in this Appeal are Parcel 12 Revised, Parcel 14 and Parcel 15 Revised. The area to be condemned as to Parcel 14 is fully described in the original Petition and the fair market value as of the filing date was $3,500.00. As to Parcel 12 Revised and Parcel 15 Revised, the areas to be condemned are fully described in Order Amending Amended Petition filed on October 14, 1958, and the fair market value as of the filing date for the parcels were respectively, $2,030.00 and $2,950.00.

"The owners and the respective interests they own are as follows: * * * (Names and interests as to the parcels of land set forth in full.)

"The Court after trial rendered its Decision on October 31, 1958, and the Judgment was entered on August 21, 1959.

"The Appellants duly filed a Notice of Appeal to the Supreme Court on September 16, 1959.

"The question or point of law presented to this Court on appeal is: Did the Territory of Hawaii (then the existing government) or any of its offices have authority to condemn the parcels of land for the purpose of donating the same to the United States of America as an addition to the Hawaii National Park in accordance with the provisions of Act 80 [*sic*], 75th Congress (52 Stat. 781).

"Wherefore, the parties hereto respectfully pray this Court to consider the appeal on the agreed statement of facts and things set forth herein, and to determine the question or point of law raised.

"Dated at Hilo, Hawaii." (Dates and signatures of counsel set forth.)

"ORDER

"The foregoing Appeal on agreed statement of facts is hereby approved.

Tamao Monden (Sgd.)
Judge, Circuit Court of the
Third Circuit, State of Hawaii."

The parties, under Rule 76, H.R.C.P., have no right to determine by stipulation the question to be decided on appeal. *Barnett* v. *United States,* 82 F. 2d 765 (9th. Cir. 1936), cert. den. 299 U.S. 546, reh. den. 299 U.S. 620. The purpose of the rule is to permit a succinct statement of the record so as to show how the questions to be submitted to the appellate court arose and were decided in the trial court.

However, an agreed statement waives issues not raised under the facts stated thereby. *Baxter* v. *McGee,* 82 F. 2d 695 (8th Cir. 1936).

The pre-trial conference order, after setting forth the

admitted facts on the ownership and descriptions of the lands involved, went on to provide:

"III

"The following issues of fact, and no others, remain to be litigated upon the trial:

"A. The fair market value of Parcels 7, 12, 14 and 15, as of the date of filing of the instant proceeding for condemnation.

"IV

"The following issues of law, and no others, remain to be litigated upon the trial:

"A. Whether the Territory of Hawaii, Plaintiff, must prove that there existed a specific appropriation for the payment of the Judgment or Judgments herein, prior to the date of commencement of the instant proceeding, as an essential element of the Plaintiff's case.

"B. Whether the Territory possesses the power and authority to institute and prosecute the instant proceeding."

Appellants by failing to urge the first question set forth above in the pre-trial conference order and by stipulating to facts which negative such defense have thereby waived the same under the rule of the *Baxter* case, *supra.*

It can be readily seen that the question of law now attempted to be posed for this Court's determination differs materially from the remaining question set forth in the pre-trial conference order presented to and decided by the trial judge. Since we are to pass on the trial judge's judgment entered therein we must, of necessity, consider only the question as presented to, considered and decided by him. 14 *Cyclopedia of Federal Procedure,* 3d ed., § 67.09, p. 120; see also *Watson* v. *Button,* 235 F. 2d 235 (9th Cir. 1956) and *Perley* v. *Roberts,* 138 F. 2d 518 (1st Cir. 1943), cert. den. 321 U.S. 788. That question was simply whether the Territory possessed "the power

and authority to institute and prosecute the instant proceeding."

The basis for the condemnation of appellants' lands by the Territory lies both in the laws of Congress creating the Hawaii National Park and the territorial government (The Hawaiian Organic Act) and in the laws of the Territory relating to eminent domain.

Public Law 171 (39 Stat. 432) enacted by the Congress in 1916, established the Hawaii National Park. This act described the boundaries of the land which made up this Park and provided specifically as follows:

"Sec. 3. That no lands located within the park boundaries now held in private or municipal ownership shall be affected by or subject to the provisions of this Act."

In other words, lands held "in private or municipal ownership" were to continue in such ownership and would not become part of the National Park. The result was a "pock-marked" national park.

Four years later, Congress enacted Public Law 150 (41 Stat. 452):

"An Act to authorize the governor of the Territory of Hawaii to acquire privately owned lands and rights of way within the boundaries of the Hawaii National Park.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the governor of the Territory of Hawaii is hereby authorized to acquire, at the expense of the Territory of Hawaii, by exchange or otherwise, all privately owned lands lying within the boundaries of the Hawaii National Park as defined by 'An Act to establish a national park in the Territory of Hawaii,' approved August 1, 1916, and all necessary perpetual easements and rights of way, or roadways, in fee

simple, over or to said land or any part thereof.

"Sec. 2. That the provisions of Section 73 of an Act entitled 'An Act to provide a government for the Territory of Hawaii,' approved April 30, 1900 [The Hawaiian Organic Act], as amended by an Act approved May 27, 1910, relating to exchanges of public lands, shall not apply in the acquisition, by exchange, of the privately owned lands herein referred to.

"Approved, February 27, 1920."

This Act in effect repealed the provisions of section 3 of Public Law 171, set out above, and gave direction as to how and through what agency these lands were to be acquired and made a part of the Park. To facilitate the Territory's acquisition of these private interests, the Congress provided that the restrictive provisions of the Hawaiian Organic Act relating to the exchange of public lands were to be inapplicable.

In 1922 by Public Law 208 (42 Stat. 503) and in 1928 by Public Law 269 (45 Stat. 424) additional lands were added to the Park.

In 1938, the Congress enacted Public Law 680 (52 Stat. 781) further enlarging the Park by adding the "Kalapana Extension" area, including the lands relevant to these proceedings. The fourth section of this act provides, *inter alia,* that the provisions of the above referred to Public Laws 171 and 150 "are made applicable to and extended over the lands hereby added to the park."

Appellee urges that the applicable federal laws above referred to did confer power and authority in the governor of the Territory of Hawaii to acquire these lands by condemnation. However, we feel that there was already power and authority in territorial law to acquire these lands by condemnation in execution of the National Park project directed by these federal laws.

The aim of Public Law 150 was merely to direct the

chief executive of the Territory to take the responsibility of acquiring lands for this National Park and to clothe his actions with legal respectability. It does not attempt to say that the governor was thereby empowered to condemn lands, or that he was granted the power to condemn lands; it merely stated in effect that it would be legal for the governor to acquire these lands for National Park purposes by "exchange or otherwise."

Appellants contend that the application of the doctrine of *ejusdem generis* necessitates a construction of the word "otherwise" as excluding the idea of a taking by eminent domain, citing *People* v. *Feitner,* 71 App. Div. 479, 75 N.Y.S. 738; *In re Willcox,* 165 App. Div. 197, 151 N.Y.S. 141; and *Barnidge* v. *United States,* 101 F. 2d 295 (8th Cir. 1939).

As to the rule of *ejusdem generis,* it has been stated:

"It is well established that the rule of *ejusdem generis* is neither final nor exclusive and is always subject to the qualification that general words will not be used in a restricted sense if the act as a whole indicates a different legislative purpose in view of the objectives to be attained. 2 Sutherland, Statutory Construction, supra, § 4914. As a general rule the use of Latin phrases to solve problems of statutory construction has not been a marked success. 'The reason for [a] rule is not clarified much by the Latin phrases in which it is sometimes clothed. They are rather restatements than explanations of the rule.' Standard Oil Co. v. Anderson, 212 U.S. 215, 220. * * * The crux of the matter is that the rule of *ejusdem generis* is only a constructionary crutch and not a judicial ukase in the ascertainment of legislative intention." *State* v. *Small,* 99 N. H. 349, 111 A. 2d 201, 202.

The purpose of the rule is to give effect to both the particular and general words, by treating the particular

words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words. *National Bank of Commerce* v. *Estate of Ripley,* 161 Mo. 126, 61 S.W. 587.

"The doctrine applies when the following conditions exist: (1) the statute contains an enumeration by specific words: (2) the members of the enumeration constitute a class; (3) the class is not exhausted by the enumeration; (4) a general term follows the enumeration: and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires." 2 Sutherland, *Statutory Construction,* 3d ed., Horack, 1943, § 4910, p. 400.

In both the *Feitner* and *Willcox* cases, *supra,* relied on by appellants, we have a situation similar to the instant case in that a single particular word is followed by the phrase "or otherwise." Under the foregoing principles, the application of the rule of *ejusdem generis* in those cases was not only unwarranted but under the factual situations there present also was unnecessary to the results obtained. In the *Barnidge* case, *supra,* also relied on by appellants, there was an enumeration of specifics followed by the phrase "or otherwise." In that case, the rule of *ejusdem generis,* was not actually employed although its application would have been more appropriate than in the present situation since there was at least an enumeration of words. Instead, the court reasoned that authority had already been granted by another act to acquire public lands by condemnation, therefore, making it unnecessary to embody such authority in the act there being considered.

Here, the phrase to "acquire by exchange or otherwise" contains no enumeration. It is true that "otherwise" is a general term and may be associated with the term

"exchange." However, there is no enumeration of specific words so as to indicate any establishment of a class to which "otherwise" is restricted. "Exchange" is the only specific term. The rule of *ejusdem generis* is therefore inapplicable to this statute.

"\* \* \* [while] the rule is a well-established and useful one, it is, like other canons of statutory construction, only an aid to the ascertainment of the true meaning of the statute. It is neither final nor exclusive. To ascertain the meaning of the words of a statute, they may be submitted to the test of all appropriate canons of statutory construction, of which the rule of *ejusdem generis* is only one. If, upon a consideration of the context and the objects sought to be attained and of the act as a whole, it adequately appears that the general words were not used in the restricted sense suggested by the rule, we must give effect to the conclusion afforded by the wider view in order that the will of the legislature shall not fail." *Helvering* v. *Stockholms Enskilda Bank,* 293 U.S. 84, 89.

"Otherwise" should be defined in the context of the whole statute, which is governmental acquisition of lands for public use, and of the intent of the Congress. Condemnation of lands is an established method of governmental acquisition of property for public use. Public Law 171 established the public lands of the area, therein described, as a national park. Thereafter, Public Law 150 directed the governor to acquire all the private lands within this area, as extended by Public Law 680. To interpret Public Law 150 as directing only the acquisition of private property by any other means exclusive of condemnation leads to an absurdity. To discover the other means exclusive of condemnation would also require the circumvention of the rule of *ejusdem generis*. The purpose of Public Law 150 was to acquire *all* privately owned

lands within the described boundaries so as to make the National Park whole and complete for the benefit of the public. It expressly provided that *all* privately owned lands were to be acquired. Without the capacity to secure private lands by voluntary purchase, gift, or exchange, supplemented by the right to condemn, the acquisition of all private lands probably could not be accomplished, with the result that the National Park would be "spotted" with areas of private lands which could not be obtained by voluntary means. Where public use and necessity are established, a private landowner should not be able to impede the functions of government. It is, therefore, clear that the Congress intended that the power of condemnation be included in the direction of Public Law 150. This was subsequently extended to include the private lands in this action by Public Law 680. To rule otherwise would be abortive of Congressional intent.

In directing a taking of private property, the Congress intended the use by the Territory of the power of eminent domain already granted it under the Hawaiian Organic Act enacted in 1900:

> "* * * Provided, That the legislature may by general act provide for the condemnation of property for public uses, * * *." (§ 55.)

The condemnation laws of the Republic of Hawaii were preserved by the provisions of the same Organic Act:

> "That the laws of Hawaii not inconsistent with the Constitution or laws of the United States or the provisions of this Act shall continue in force, subject to repeal or amendment by the legislature of Hawaii or the Congress of the United States. * * *" (§ 6.)

One of those laws so continued in effect was Civil Laws 1897, § 1542, which provided in part that:

> "Private property may be taken for the following purposes, which are declared to be public uses, to wit:

sites for public buildings, * * * also all necessary land for the growth and protection of forests, public squares and pleasure grounds; * * *."

This language remained unchanged in the general condemnation law of the Territory until after the instant suit was filed when it was amended by Act 12, S.L.H. 1951.

This state of the territorial condemnation law, known to the Congress at the time of the passage of Public Laws 171, 150 and 680 leads inevitably to the conclusion that the Congress in directing the governor of the Territory to "acquire * * * lands, by exchange or otherwise" did so with the intention and expectation that the governor would utilize every power with which the government of which he was the chief executive was endowed to fully execute the course of action designated by these Public Laws, including the power of eminent domain.

Appellants contend that had the Congress intended a taking by condemnation it would have said so since it was a simple matter to do so. Since the Territory already had the power of eminent domain at the time of the enactment of Public Law 150, it would appear more likely that, had the Congress intended that no lands were to be acquired in this manner, it would have included language specifically prohibiting the use of such power.

It should be noted that Public Law 150 provided that these lands were to be acquired "at the expense of the Territory of Hawaii." It is clear that the Congress did not intend the expenditure of any federal funds for the purposes of these acts, but did intend that the Territory finance the project. Further, an expenditure of monies was contemplated. Since land acquisition, other than by exchange or gift, does involve the payment of sums of money, it would be absurd of the Congress to exclude, from its intent, the acquisition of these lands by condemnation in the absence of express discriminating and selective language to that effect.

The underlying purpose of these Public Acts negative any such limited and selective intent to exclude acquisition by condemnation. Public Law 171 described the outer boundary of the National Park. It also specifically stated that the private ownership of lands within this boundary was to remain undisturbed. Four years later, the governor was directed to acquire, at the expense of the Territory, these privately owned lands by Public Law 150. There is no dispute that the provisions of Public Law 150 apply to the lands, including appellants' lands, added to the National Park by Public Law 680. *Cf., Trimmier* v. *Carlton,* 116 Tex. 572, 296 S.W. 1070; *Young* v. *United States,* 178 F. 2d 78 (9th Cir. 1949) cert. den. 339 U.S. 913; *Johnson* v. *Killion,* 178 Kan. 154, 283 P. 2d 433; *Phoenix Assur. Co.* v. *Fire Department,* 117 Ala. 631, 23 So. 843; *Panama R.R. Co.* v. *Johnson,* 264 U.S. 375. The Territory was empowered before these enactments to take land by condemnation. The underlying desire of the Congress to make the Park whole by the extinction of all privately owned parcels of land within its outer boundaries necessitates the expenditure of funds for the taking of these lands through the exercise by the Territory of its power of eminent domain.

Despite the general territorial laws on eminent domain, appellants contend that they are superseded in this case by the provisions of Joint Resolution 11, S.L.H. 1943, which prevented the use of the power of condemnation as to the lands in question. The basis for this argument is that while section 2 of this resolution directs a taking "by purchase or condemnation" of certain nearby land, section 3, which could apply to the lands here involved, authorizes a taking only by purchase. Section 3 provides as follows:

"That in the event that the land described in section 2 hereof does not require the entire amount herein-

after appropriated for its purchase, the commissioner
of public lands is hereby authorized to expend any
surplus in said amount, left after the acquisition of
such land, in the purchase of such other lands as he
may deem necessary or proper for the use by the United
States as part of said national park."

Section 4 had appropriated $15,000 for the purposes of this
resolution. Section 3 does not purport to say that all lands
other than those mentioned in section 2 which were to be
acquired for the National Park could henceforth be ac-
quired only by way of purchase. It merely states that if
there were monies left over from the amount appropriated
after paying for the acquisition of the land described in
section 2, then such surplus could be used to purchase
lands for the National Park. To the extent that this
surplus was involved, it might be true that such could be
used to pay for lands acquired only by purchase and not
by condemnation. There is nothing in the facts set out
in the agreed statement, nor in the record on appeal, in-
dicating that monies from the surplus of the appropri-
ation made in this resolution were being used to pay for
the acquisition of appellants' lands. Joint Resolution 11
cannot be considered as affecting the power and authority
of the Territory under the general condemnation laws and
consequently has no bearing on the issue involved here.

Appellants raise the point that this suit was not insti-
tuted by the officer designated by law. This question
deals with the exercise of the power and authority to con-
demn rather than with the existence of such power and
authority which is the only question presented by this
appeal as we have earlier indicated.

They also urge, for the first time on this appeal, that
Public Law 680 is unconstitutional. This issue of uncon-
stitutionality is not presented under the facts set forth
in the agreed statement. From the record on appeal, it

was not presented to nor considered and decided by the trial judge. If the power and authority to condemn in these proceedings had been considered to have devolved upon the Territory by virtue of these Public Acts, then this issue might have been pertinent under the question of power and authority properly before the trial court by the pre-trial conference order and this court as indicated at the outset of this opinion. But since we have found the Public Acts to be directory and the issue is belatedly raised, we withhold ruling on the constitutionality of Public Law 680 until properly and timely presented by a party litigant actually affected. *Cf., People* v. *Town of Cicero,* 404 Ill. 432, 89 N.E. 2d 350; *Heard* v. *Pittard,* 210 Ga. 549, 81 S.E. 2d 799; *City of Talladega* v. *Ellison,* 262 Ala. 449, 79 So. 2d 551; *Jos. Schlitz Brewing Co.* v. *City of Milwaukee,* 232 Wis. 118, 286 N.W. 602; *Department of Public Works & Bldgs.* v. *Butler Co.,* 13 Ill. 2d 537, 150 N.E. 2d 124; 16 C.J.S., *Constitutional Law,* § § 87, 88, p. 260. Courts generally will not pass upon the constitutionality of a law unless necessary to the determination upon the merits of the cause under consideration. *Cf., Ashwander* v. *Valley Authority,* 297 U.S. 288.

The remaining question to be decided concerns itself as to whether or not the taking of land by the Territory, through the exercise of its power of eminent domain for the purpose of conveying such land to the United States for a National Park within the confines of the Territory is a "public use."

The general rule and majority view that a state may properly exercise its power of eminent domain for the benefit and use of the United States, as set forth in the *Annotation,* 143 A.L.R. 1040, 1042, has been refined so that "the state may not exercise its power of eminent domain on behalf of the United States in connection with uses which are exclusively national in character, such as

post offices, custom houses, or federal courts, but such condemnation may be had where a partial benefit, at least, accrues to the state." 1 Nichols, *Eminent Domain*, 3d ed., § 2.113[3], p. 111; *Via v. State Commission On Conservation, Etc.*, 9 F. Supp. 556 (W.D. Va. 1935), aff'd 296 U.S. 549. In the *Via* case, it was held that a taking of land by the state for the purpose of then conveying it to the United States for a national park was a valid taking.

> "* * * The power [of eminent domain] exists, in any state, for the promotion of the safety, convenience, welfare, and happiness of the people of that state. Conceding that the power of eminent domain must be exercised by a state only in connection with some public function of that state, it must also be conceded that the furtherance of the health, pleasure, and recreational facilities of its people is a function of the state. If this be true, and it undoubtedly is, is the right of the state to perform this function, to accomplish this purpose, to be denied because the manner of its accomplishment involves the cession to the federal government of land which the latter agrees to maintain for this purpose? Is the state in the performance of a legitimate function forbidden to accomplish it through such means or agency as it chooses? We think not. * * *" 9 F. Supp. 556, at 562.

See also *State v. Oliver*, 162 Tenn. 100, 35 S.W. 2d 396; *County of San Benito v. Copper Mountain Mining Co.*, 7 Cal. App. 2d 82, 45 P. 2d 428.

Public Law 171 states that:

> "* * * the tracts of land on the island of Hawaii and on the island of Maui, in the Territory of Hawaii, hereinafter described, shall be perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States, * * *."

This provision applied to the lands in question by virtue of section 4, of Public Law 680. It is thus clear that Hawaii and its people, as "people of the United States," will obtain benefit and enjoyment from the instant action, which is a proper exercise of the Territory's power of eminent domain for public use.

Accordingly, the judgment appealed from is affirmed.

*Shiro Kashiwa,* Attorney General (*Henry H. Shigekane* and *Vernon F. L. Char,* Deputy Attorneys General, with him on the briefs) for plaintiff-appellee.

*Kazuhisa Abe* (also on the briefs) for defendants-appellants.