STATE OF NORTH CAROLINA v. CORE BANKS CLUB PROPERTIES, INC.

No. 19

(Filed 19 May 1969)

1. **Eminent Domain § 7— pleadings — allegations that condemnor has complied with statute**

Allegations by the condemnor that it has complied with statutory procedural requirements are a prerequisite in any action to condemn land.

2. **Eminent Domain § 4— delegation of power — Department of Administration — national seashore park**

In the absence of specific legislative authorization, the Department of Administration has no power to condemn Outer Banks property for conveyance to the United States for a national seashore park.

3. **Eminent Domain § 1— nature and extent of power — constitutional limitations**

The right of eminent domain is not conferred by constitutions but is inherent in sovereignty, although its exercise is limited by the constitutional requirements of due process and payment of just compensation for property condemned.

4. **Eminent Domain § 4; Constitutional Law § 7— legislative powers — eminent domain**

Under our division of governmental power into three branches — executive, legislative and judicial — only the legislative can authorize the exercise of the power of eminent domain and prescribe the manner of its use.

5. **Eminent Domain §§ 1, 4— nature and extent of power — legislature**

The right of eminent domain lies dormant in the State until the legislature, by statute, confers the power and points out the occasion, mode, conditions and agencies for its exercise.

**6. Eminent Domain § 4— delegation of power — Department of Administration**

The Department of Administration, as land acquisition agent for the State and its agencies, can effect only the condemnations which the legislature authorizes; it may not decide the public purpose or initiate the project for which the State's power of eminent domain may be used. G.S. 146-22 *et seq.*, G.S. 143-335 *et seq.*, G.S. 143-341(4).

**7. Eminent Domain § 1— extent of power — effect of procedural statute**

A statute which merely sets forth a mode of procedure will not impliedly grant the power of eminent domain.

**8. Eminent Domain § 4— delegation of power — Department of Administration — national seashore park**

The State Capital Improvement Act of 1959 (Session Laws of 1959, Ch. 1039), which grants to the Department of Conservation and Development the power to condemn land in connection with preserving and rehabilitating the Outer Banks, does not authorize the State, acting through the Department of Administration, to condemn Outer Banks property in order to convey it to the United States government for a national seashore park, even though shore-erosion control and the preservation of the Outer Banks will be one of the prime objectives of the park.

**9. Eminent Domain § 4— delegation of power — Department of Administration — national seashore park**

Resolution 66, Session Laws of 1965, wherein the General Assembly endorsed the Cape Lookout National Seashore project, does not authorize condemnation by the State of Outer Banks property for the purpose of conveying it to the United States or for any other purpose.

**10. Eminent Domain § 4— delegation of power — statutory construction**

In construing statutes which are claimed to authorize the exercise of the power of eminent domain, a strict rather than a liberal construction is the rule.

**11. Eminent Domain §§ 1, 4— extent and delegation of power — statute**

The right of eminent domain must be conferred by statute, either in express words or by necessary implication.

**12. Eminent Domain § 4— delegation of power — G.S. 146-36 — national seashore park**

G.S. 146-36, providing that the Governor and Council of State may enter into contract or other agreement binding the State to acquire for and to convey to the United States government land or any interest in land, confers no power of eminent domain upon the State to acquire Outer Banks property for a national seashore park.

**13. Eminent Domain §§ 1, 3— exercise of power for use of federal government**

Where a partial benefit at least accrues to the State, it may properly

exercise its power of eminent domain for the benefit and use of the United States except in connection with uses which are exclusively national in character.

**14. Eminent Domain § 3— public purpose — national seashore park**
     Condemnation by the State of Outer Banks property for conveyance to the United States for a national seashore park is a condemnation for a public purpose.

HIGGINS, J., dissents.

APPEAL by plaintiff from *Cohoon, J.,* 25 November 1968 Civil Session of CARTERET, certified pursuant to G.S. 7A-31(b)(1) for review by the Supreme Court before determination by the Court of Appeals.

Action for condemnation of land, heard on demurrer. The complaint alleges: The sovereign State of North Carolina, acting through its Department of Administration and with the approval of the Governor and Council of State, is empowered by N. C. Gen. Stat. Ch. 146, Art. 6 (G.S. 146-22 *et seq.*) to condemn land in the manner prescribed by G.S. 136-103 *et seq.* Defendant owns approximately 950 acres in Carteret County lying between the Atlantic Ocean and Core Sound. Acquisition of this specifically described land by the State is necessary "for the creation of a federally-sponsored National Seashore," to protect the Outer Banks of North Carolina, and to preserve their "natural scenic beauty, recreational potential and historical interest." Plaintiff has in good faith negotiated with defendant for the purchase of the described property, but has been unable to buy it. By this proceeding, instituted with the approval of the Governor and Council of State, the State seeks to acquire the property in fee simple.

The prayer for relief is that the court determine the "just compensation" which plaintiff should pay defendant for the land described in the complaint.

At the time of filing the complaint, the State deposited in the office of the clerk of the Superior Court of Carteret County the sum of $64,360.00 as its estimate of just compensation for the property.

Thereafter defendant demurred to the complaint and applied to the court for an injunction restraining plaintiff "from taking possession of the defendant's property and from conveying it to the Federal Government and from otherwise exercising dominion over the property and interfering with the use and enjoyment thereof by defendant." Judge Exum signed a temporary restraining order. It was made returnable before Judge Cohoon, who heard the matter on

25 November 1968. From his judgment sustaining the demurrer and dismissing the action, plaintiff appealed.

*Robert Morgan, Attorney General; Parks H. Icenhour, Assistant Attorney General; Rafford E. Jones, Real Property Attorney, for the State.*

*McLendon, Brim, Brooks, Pierce & Daniels by Hubert Humphrey for defendant appellee.*

SHARP, J.

Defendant demurs to the complaint upon the following grounds: (1) It discloses no statutory authority for the State to condemn its property for the purpose alleged — a federally owned park —; (2) it reveals that the condemnation is not for a State public use; and (3) it fails to allege compliance with statutory requirements, which are conditions precedent to the institution of this action.

**[1]** We postpone at the outset the basic question whether the law now authorizes the condemnation in suit and advert to defendant's third ground for demurrer, *i.e.*, that plaintiff has not alleged compliance with statutory procedural requirements. Such allegations are a prerequisite in any action to condemn land. *Redevelopment Commission v. Hagins*, 258 N.C. 220, 128 S.E. 2d 391.

G.S. 146-22 through G.S. 146-36, the authority under which plaintiff alleges its right to condemn the land in suit, provides that *all* acquisitions of land by the State or any State agency shall be made by the Department of Administration (Department) and approved by the Governor and Council of State. Before Department can acquire land by purchase or condemnation the following steps must be taken: (1) The agency must file with Department an application setting forth its need for the requested acquisition. (2) Department "must investigate all aspects of the requested acquisition" (including the availability of the necessary funds) as detailed in G.S. 146-23. (3) After investigation, Department must determine that the best interests of the State require that the land be acquired. (4) Department must then negotiate with the owners for the purchase. If terms are agreed upon and the Governor and Council of State approve them, Department buys the land. (5) If negotiations are unsuccessful and the Governor and Council of State give permission, Department institutes condemnation proceedings as provided in G.S. 146-24 and G.S. 136-103.

G. S. 136 - 103 requires, *inter alia,* that the complaint con-

tain "a statement of the authority under which and the public use for which said land is taken."

Defendant concedes that plaintiff has alleged the performance of conditions (4) and (5) as enumerated above. It contends, however, that the performance of conditions (1), (2), and (3) are not alleged; that the requirement of G.S. 136-103 that the complaint contain a statement of the authority under which the land is taken was not met; and that these omissions render the complaint fatally defective and require the dismissal of the action.

Plaintiff's contention is that allegation of these statutory requirements is not necessary, since the State itself — not one of its agencies — seeks to obtain title to unique property for a Federal park. Notwithstanding, the stark allegations of the complaint are unsatisfactory and incomplete. Nevertheless, we pass defendant's contention that the failure to allege compliance with statutory procedural requirements is fatal and consider these questions: (1) Does G.S. 146-22 *et seq.*, the "authority" under which plaintiff states it brings this action, authorize the condemnation? (2) If not, does any authority empower plaintiff to condemn the land for the purpose alleged? We deem this course to be in the public interest.

The complaint alleges no federal law authorizing a "National Seashore" in Carteret County. Although the purpose of such a seashore is stated in general terms, the complaint alone would leave us to deduce from the location of the land that plans for a National Park are in the offing. Plaintiff-appellant's brief confirms this deduction and directs our attention to the following acts of the General Assembly and Congress.

(1)  *A Joint Resolution Endorsing The Cape Lookout National Seashore Project.* Resolution 66, S. L. 1965. This resolution states in part:

"WHEREAS, the President of the United States has proposed the establishment of the Cape Lookout National Seashore on the coast of North Carolina; and

"WHEREAS, the State of North Carolina has offered the Federal Government suitable land for the establishment of this facility; and "* * *

"WHEREAS, the history of Cape Hatteras National Seashore Recreational Area has proved the immeasurable esthetic, economic, and recreational value of such an asset within North Carolina; and

"WHEREAS, the increase in both population and leisure time in

the United States add each day to the importance of outdoor areas for public use:

*Now, therefore, be it resolved by the Senate, the House of Representatives concurring:*

"Section 1. That the General Assembly does hereby endorse the Cape Lookout National Seashore project and encourage the Governor and all affected agencies of State Government to encourage and assist the project to the end that its establishment may be assured at the earliest possible date.

"* * *"

(2) *16 U.S.C.A. § 459 (1960).* By this enactment, approved 10 March 1966, the Congress of the United States authorized the establishment of the Cape Lookout National Seashore (Seashore) "in order to preserve for public use and enjoyment" the Outer Banks of Carteret County, N. C., between Ocracoke Inlet and Beaufort Inlet. In brief summary, pertinent provisions of the Act are (enumeration ours):

(a) Non-federal land within the seashore, except Shackleford Banks and a very small area on Lookout Bight, adjoining Cape Lookout Lighthouse, may be acquired by the Secretary of the Interior *only through donation.* (The boundaries of the proposed Seashore are shown on map VS-CL-T101B on file in the office of the National Park Service, Department of Interior.)

(b) When title to the lands, acquired under the preceding section, has been vested in the United States, the Secretary of the Interior shall declare the establishment of the Seashore and define its boundaries. After such establishment, and subject to the limitations and conditions of the Act, the Secretary may acquire the remainder of the lands within the Seashore.

(c) The Secretary may exchange federally owned property in North Carolina for nonfederal property within the Seashore and may equalize the values by paying or receiving cash.

(d) A sum not to exceed $3,200,000 is "authorized to be appropriated" for the acquisition and development of the Seashore in accordance with the purposes of this Act.

(Other sections of the Act provide for state and federal control of hunting and fishing, shore-erosion control, and general administration by the Secretary of Interior.)

**[2]** Plaintiff does not rely upon specific legislative authority to condemn property for the Seashore. Its thesis seems to be: (1) The

State, not one of its political subdivisions or administrative agencies, here seeks to exercise its own sovereign right to condemn. (2) Under G.S. 146-22 the Department is the agency designated to exercise the State's power of eminent domain. (3) This designation not only authorizes the Department to institute condemnation proceedings in the name of the State, but also empowers it to declare a necessary public use. In other words, plaintiff contends that it has the discretion and the power to condemn land for a federal park without specific legislative authorization. This contention is insupportable.

[3]    The right to take private property for public use, the power of eminent domain, is one of the prerogatives of a sovereign state. The right is inherent in sovereignty; it is not conferred by constitutions. Its exercise, however, is limited by the constitutional requirements of due process and payment of just compensation for property condemned. *Redevelopment Commission v. Hagins, supra; Morganton v. Hutton & Bourbonnais Co.*, 251 N.C. 531, 112 S.E. 2d 111; 3 N. C. Index 2d, Eminent Domain §§ 1, 4 (1967); 29A C.J.S. *Eminent Domain* § 3 (1965).

[4, 5]    In *Hedrick v. Graham*, 245 N.C. 249, 256, 96 S.E. 2d 129, 134, and *Lloyd v. Venable*, 168 N.C. 531, 533, 84 S.E. 855, 856, this Court noted and acknowledged this universally accepted principle: Under our division of governmental power into three branches — executive, legislative, and judicial — only the legislative can authorize the exercise of the power of eminent domain and prescribe the manner of its use. The right of eminent domain lies dormant in the State until the legislature, by statute, confers the power and points out the occasion, mode, conditions and agencies for its exercise. *Accord, Society of the New York Hospital v. Johnson*, 5 N.Y. 2d 102, 154 N.E. 2d 550 (1958); *Oregon State Highway Commission v. Stumbo*, 222 Ore. 62, 352 P. 2d 478, 2 A.L.R. 3d 1028, 1032 (1960); 29A C.J.S. *Eminent Domain* § 2 (1965); Annot., 22 L.R.A. (NS) 1, 11-22 (1909); *see also* Annot., 79 A.L.R. 515 (1932).

In *Hedrick v. Graham, supra,* Parker, J. (now C.J.), cited with approval 18 Am. Jur. *Eminent Domain* § 9 (1938), which contains the following statement: "The executive branch of the government cannot, without the authority of some statute, proceed to condemn property for its own uses. . . . Once authority is given to exercise the power of eminent domain, the matter ceases to be wholly legislative. The executive authorities may then decide whether the power will be invoked and to what extent, and the judiciary must decide whether the statute authorizing the taking violates any constitutional rights; and the fixing of the compensation is wholly a

judicial question." *Accord,* 26 Am. Jur. 2d *Eminent Domain* § 5 (1966).

Plaintiff argues that G.S. 146-22 *et seq.* and G.S. 143-341(4)(d) give Department (with the approval of the Governor and Council of State) carte blanche to condemn property. The wording of the statutes, their legislative history, and the actualities of political and economic life make it clear that the General Assembly did no such thing. It is not to be supposed that the legislature, which holds the purse strings and must appropriate the money to pay for the lands which Department condemns, would delegate to Department its prerogative to designate the public purpose for which the State's power of eminent domain may be used and its revenues spent. *Vance County v. Royster,* 271 N.C. 53, 155 S.E. 2d 790. *See also State v. Lyle,* 100 N.C. 497, 503, 6 S.E. 379, 380-81, and note G.S. 129-15, G.S. 136-89.64, G.S. 140-5.6.

The Report of the Commission on Reorganization of State Government (Commission), transmitted to the governor on 15 November 1956, recommended that the General Assembly establish a Department of Administration, responsible to the Governor, to direct the "staff and housekeeping activities of the government." It also recommended that "in the interests of better over-all efficiency" the Department as a "single staff agency" be given "the duty of acquiring (as well as renting or leasing) real property for all State agencies other than rights-of-way for the State Highway and Public Works Commission subject to the approval of the Governor and Council of State." *Id.* at 33.

In 1957, the legislature implemented the Commission's Report by creating Department, G.S. 143-335 *et seq.,* and assigning to it the acquisition and control of State realty, G.S. 143-341(4), G.S. 146-22 *et seq.* In its Ninth Report, filed 21 November 1958, the Commission made additional recommendations (not pertinent here) with reference to State land management. It noted that "the principal effect of the 1957 legislation was to transfer to the Department of Administration the power to make all acquisitions and most dispositions of land on behalf of the State and its agencies. The Department, however, can act only upon request of another State agency. . . ." *Id.* at 79.

**[6, 7]** By G.S. 146-22 *et seq.* the legislature merely appointed Department as acquisition agent and established the procedure it should follow in acquiring land. "[A] statute which merely sets forth a mode of procedure will not impliedly grant the power (of eminent domain)." 1 Nichols, Eminent Domain § 3.213 (1964). Thus, De-

partment can effect only the condemnations which the legislature authorizes; it may not decide the public purpose or initiate the project for which the State's power of eminent domain may be used. *See United States v. 458.95 Acres of Land,* 22 F. Supp. 1017, 1019 (E. D. Pa. 1937); 2 Nichols, Eminent Domain § 7.4 (1963).

[8] The State Capital Improvement Act of 1959 (S. L. 1959, Ch. 1039) is not mentioned in the complaint. Notwithstanding, plaintiff now contends (1) that the Act, which appropriated $600,000 and granted to the Department of Conservation and Development the power to condemn land "in connection with" preserving and rehabilitating the Outer Banks between Ocracoke Inlet and Cape Lookout — when considered along with Resolution 66, G.S. 146-22 *et seq.* and G.S. 143-341(4)(d) — gives Department specific authority to condemn the land in suit, and (2) that after the land is thus acquired, G.S. 146-36 will empower plaintiff to convey it to the Federal Government for the Seashore, authorized by 16 U. S. C. A. § 459 (1960).

The contention refutes itself. Plaintiff is not seeking to condemn the land so that its Department of Conservation and Development can stabilize the Outer Banks south of Hatteras, the purpose authorized by the 1959 Act. Plaintiff seeks to condemn the land in order to convey it to the United States for a National park. The fact that shore erosion control and the preservation of the Outer Banks will be one of the prime objectives of the National Park Service once the Seashore is established does not eliminate the requirement of specific statutory authority for plaintiff to condemn land for a Federal park. The 1959 Act (§ 7.1(c)) contains a provision that all funds to be used by the Department of Conservation and Development in restoring the Outer Banks, "including funds paid to the State by the Federal Government," should be deposited in a special account. Thus it is clear that in 1959 the legislature did not contemplate transferring title to this section of the Outer Banks to the United States.

[9-11] Between 1959 and the passage of Resolution No. 66 in 1965, however, the State apparently began to look to the Federal Government for help in halting erosion on the Outer Banks to the south of the Hatteras Seashore. Resolution No. 66, however, does not authorize the condemnation of these lands for the purpose of conveying them to the United States or for any other purpose. "In construing statutes which are claimed to authorize the exercise of the power of eminent domain, a strict rather than a liberal construction is the rule." *Griffith v. R. R.,* 191 N.C. 84, 89, 131 S.E. 413, 416. The

right must be conferred by *statute,* either in express words or by necessary implication. 29A C.J.S. *Eminent Domain* § 22 (1965).

**[12]** G.S. 146-36, which plaintiff contends would empower it to convey the Outer Banks to the Federal Government once it acquired title to them, is the last section of "Article 8, Miscellaneous Provisions" of Chapter 146. The section provides:

"*Acquisitions for and conveyances to Federal government.* The Governor and Council of State may, whenever they find that it is in the best interest of the State to do so, enter into any contract or other agreement which will be sufficient to comply with Federal laws or regulations, binding the State to acquire for and to convey to the United States government land or any interest in land, and to do such other acts and things as may be necessary for such compliance.

"The Governor and Council of State may authorize any conveyance to the United States government to be made upon nominal consideration whenever they deem it to be in the best interest of the State to do so."

We are not here called upon to define the limits of the authority conferred by this section. A literalist might well argue that it would empower the Governor and Council of State, should they deem it in the State's best interest, to convey the Art Museum or any other State property to the Federal Government. Indeed, this is the conclusion to which plaintiff's argument would lead. We are not convinced that this statute, codified under "Miscellaneous Provisions," confers such unlimited powers. However, for now it suffices to say that G.S. 146-36 confers no power of eminent domain; and that plaintiff has alleged no contract between the State and Federal Government binding the State to convey defendant's property to the United States.

Finally, we consider defendant's second ground for demurrer, *i.e.,* that condemnation for a Federal park is not a proper state purpose.

**[13]** The general rule today is that "where a partial benefit, at least, accrues to the State," it may properly exercise its power of eminent domain for the benefit and use of the United States except "in connection with uses which are exclusively national in character, such as post offices, custom offices or federal courts. . . ." *State v. Tin Yan,* 44 Hawaii 370, 383, 355 P. 2d 25, 32-33 (1960). *Accord, County of San Benito v. Copper Mountain Mining Co.,* 7 Cal. App. 2d 82, 45 P. 2d 428 (1935); *Schooler v. State,* 175 S.W. 2d 664 (Civ. App. Texas 1943); 26 Am. Jur. 2d *Eminent Domain* § 12 (1966); *see* Annot., 143 A.L.R. 1040 (1943). North Carolina is in accord

with the foregoing rule. *Yarborough v. Park Commission*, 196 N.C. 284, 145 S.E. 563.

In the past, North Carolina has transferred title to the United States for a National Park. By P. L. 1927, Ch. 48, the General Assembly created the North Carolina Park Commission. This Act (1) directed the Commission to acquire title in the name of the State to the lands described in the Federal Act authorizing the establishment of the Great Smoky Mountains National Park; (2) authorized the issuance of State of North Carolina Park Bonds in an amount not to exceed two million dollars for the purpose and for their payment pledged the full faith, credit and taxing power of the State; (3) vested the Commission with the power of eminent domain to acquire land "in the name and in behalf of the State"; (4) authorized the Commission "to contract to give, grant, convey and transfer to the United States of America for National Park purposes all right, title and interests" which the State might acquire in the lands; and (5) authorized the Governor, with the attestation of the Secretary of State, to convey these lands to the United States.

In *Yarborough v. Park Commission, supra,* plaintiff, a taxpayer, sought to restrain the issuance of the bonds authorized by P.L. 1927, Ch. 48, for that, *inter alia,* they were for a federal, not a state public purpose. In sustaining the demurrer, this Court said that the Commission's authority to acquire land for the Great Smoky Mountains National Park was not impaired by its authorization "to cede the acquired property to the Federal Government in consideration of the public benefit to be derived from the establishment of a national park. . . . Under the doctrine of eminent domain the title may be acquired on behalf of the State and then by legislative and congressional assent it may be transferred to the United States." *Id.* at 291, 145 S.E. at 568-69. The Court concluded: "As the use contemplated by the act of 1927 is a public use, the extent to which property shall be taken for such use rests in the discretion of the Legislature, subject to the restraint that just compensation shall be made." *Id.* at 293, 145 S.E. at 569.

Citing *Yarborough v. Park Commission, supra,* the Supreme Courts of Tennessee and Virginia upheld legislation similar to P. L. 1927, Ch. 48, by which their legislatures had authorized the condemnation of land for conveyance to the United States for the Great Smoky Mountains National Park (Tenn.) and the Shenandoah National Park (Va.). *State v. Oliver,* 162 Tenn. 100, 35 S.W. 2d 396 (1931); *Rudacille v. State Commission,* 155 Va. 808, 156 S.E. 829 (1931). The Supreme Court of Tennessee observed:

"Notwithstanding the area acquired for park purposes by Tennessee is to be conveyed to the United States and controlled by the latter government, the state of Tennessee will be the chief beneficiary of the undertaking. . . . (It will) be more available to the people of Tennessee than to the people of any other state, with the possible exception of the people of North Carolina. Our people will enjoy every advantage from this park operated by the federal government that they would enjoy if it were operated by our own state. . . . [W]hile the citizens of Tennessee will not have superior rights in the park, they will have superior advantages in enjoying common rights." *State v. Oliver, supra* at 109-10, 35 S.W. 2d at 399. *Accord, Via v. State Commission on Conservation, etc.,* 9 F. Supp. 556 (W. D. Va. 1935).

The foregoing observations of the Tennessee Court with reference to that portion of the Great Smoky Mountains National Park located within its borders can, of course, be made with reference to the advantages which North Carolina citizens would derive from the Point Lookout National Seashore. Even more important, however, the Federal Government would assume responsibility for the control of the shore erosion which threatens the unique Outer Banks. Their preservation is of vital importance not only to Eastern North Carolina but also to the entire State.

**[2, 14]**    There is no merit in defendant's contention that the proposed condemnation is not for a proper public purpose. Notwithstanding, specific legislation will be required to authorize the condemnation of land within the proposed Seashore before it can be conveyed to the United States for that purpose. *United States v. Martin,* 140 F. Supp. 42 (M.D.N.C. 1956); *Uhlmann v. Wren,* 97 Ariz. 366, 401 P. 2d 113 (1965); *County of San Benito v. Copper Mountain Mining Co., supra; Greater Baton Rouge Port Commission v. Morley,* 232 La. 87, 93 So. 2d 912 (1957); *Volden v. Selke,* 251 Minn. 349, 87 N.W. 2d 696 (1958); *Richardson v. Cameron County,* 275 S.W. 2d 709 (Civ. App. Texas 1955). In 1965 the General Assembly expressed its desire that the Cape Lookout National Seashore be established "at the earliest possible date." If that is still its wish, it may yet enact the necessary legislation.

The order of Cohoon, J., sustaining the demurrer and dismissing the action is

Affirmed.

HIGGINS, J., dissents.