IN THE SUPREME COURT OF NORTH CAROLINA

No. 250PA21-2

Filed 23 August 2024

DEPARTMENT OF TRANSPORTATION

v.

BLOOMSBURY ESTATES, LLC,

BLOOMSBURY ESTATES CONDOMINIUM HOMEOWNERS' ASSOCIATION, INC.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 281 N.C. App. 660 (2022), reversing in part and affirming in part the order and final judgment entered on 3 March 2021 by Judge Vinston M. Rozier Jr. in Superior Court, Wake County and remanding the case. Heard in the Supreme Court on 31 October 2023.

*No brief for plaintiff-appellee Department of Transportation.*

*Thomas, Ferguson & Beskind, LLP, by Jay H. Ferguson for defendant-appellant Bloomsbury Estates, LLC.*

*Law Firm Carolinas, by T. Keith Black and Harmony W. Taylor; and Rossabi Law Partners, by Gavin J. Reardon, for defendant-appellee Bloomsbury Estates Condominium Homeowners Association, Inc.*

RIGGS, Justice.

This case asks us to examine the scope of issues that must be resolved within an eminent domain action under N.C.G.S. §§ 136-103 to -121.1 when the subject

property is part of a condominium association. A complicating factor in this case is that the property subject to the taking was owned by a condominium association and the condominium declaration granted development rights for a portion of the property to defendant-appellant, Bloomsbury Estates, LLC (the Developer). Therefore, both the Developer and the Bloomsbury Estates Condominium Homeowners Association, Inc. (the Association) were parties to the eminent domain action and had rights to the property at the time of the taking.

Outside of this eminent domain action (the Taking Action), however, the Developer and the Association initiated separate litigation regarding the validity of the development rights and the interests of the property at the time of the taking. By litigating the development rights separately—that is, to some extent, initiating litigation of the interests in the land outside of the eminent domain action and, more specifically, outside of the hearing pursuant to N.C.G.S. § 136-108—the Developer and the Association created three proceedings with interconnected issues and now ask this Court to determine whether the Taking Action can be resolved prior to the resolution of the other claims in the separately-filed actions. The Developer argues the other claims can be litigated separately and the trial court appropriately granted the Developer's motion for summary judgment, distributing the bulk of the compensation from the taking to the Developer. In contrast, the Association contends that issues in the other cases affect the valuation of the property on the date of the taking and therefore must be decided before the compensation can be distributed.

We hold that the trial court did not err in granting summary judgment prior to resolution of the parties' issues in other cases because those issues were not pleaded in the Taking Action on appeal here. Summary judgment is proper when all pleaded issues affecting the rights of the property as of the date of the taking are resolved prior to final judgment. *See Century Commc'n, Inc. v. Hous. Auth.*, 313 N.C. 143, 145 (1985) ("Summary judgment is appropriate only if the pleadings and other materials before the trial judge show that there is no genuine issue of material fact and that any party is entitled to a judgment as a matter of law."). Section 136-108 of the General Statutes establishes that, in a hearing under this statutory provision, "the judge . . . shall . . . hear and determine any and all issues raised by the pleadings other than the issue of damages, including, but not limited to, if controverted, questions of necessary and proper parties, title to the land, interest taken, and area taken." N.C.G.S. § 136-108 (2023).

Here, the parties settled via consent judgment the total amount of damages (just compensation), so there can be no dispute of material fact as to that matter. To the extent there was a dispute over how the just compensation should be distributed amongst the parties the trial court adopted the Association's appraisal on relative distribution and the Developer disclaims any dispute over that on appeal. Thus, the matter was ripe for resolution on a motion for summary judgment.

At the hearing for determination of issues other than damages (the N.C.G.S. § 136-108 hearing) the trial court resolved controverted questions of title to the land

and interest taken that were raised in the action's pleadings. *See generally id.* Specifically, although the eminent domain statutory scheme is comprehensive and generally designed to avoid piecemeal litigation, the validity of the amendment at issue in this case was determined in a separate action and the parties were estopped then from relitigating that matter at the N.C.G.S. § 136-108 hearing.

Along a similar vein, we are generally hesitant to stay or interrupt all condemnation proceedings until later-instituted parallel proceedings conclude. *See Watters v. Parrish*, 252 N.C. 787, 791 (1960) (recognizing that a trial court's decision to hold one lawsuit in abeyance pending the outcome of another case will not be disturbed absent an abuse of discretion). Here, where the legal question of the parties' relative interests in the taken property had already been settled, staying the Taking Action for final resolution of all other litigation serves no purpose. For the reasons articulated below, we thus reverse the Court of Appeals' decision.

## I. Factual & Procedural Background

### A. Factual Background

The Bloomsbury Estates Condominium Development is situated on a tract of land in downtown Raleigh, adjacent to Raleigh Union Station. Development of the property began in 2006 when the Developer received approval from the City of Raleigh Planning Commission and City Council to build two phases of condominium buildings on the property. Phase I consisted of a building with fifty-six condominiums and Phase II consisted of an additional building with an additional fifty-four

condominiums and amenities to serve both buildings, including a proposed pool and fitness center. The Developer built the Phase I building and sold the fifty-six condominiums in the Phase I building before the Department of Transportation (DOT) initiated the Taking Action on 27 July 2015. In the Taking Action, the DOT permanently took approximately one-third of the Phase II land for a railroad right of way and temporarily took an additional quarter acre for a construction easement to expand the Raleigh Union Station. The land the DOT took coincided with the planned location of the Phase II building, preventing the construction of the Phase II building until the temporary easement ended on 13 September 2017, and affecting the cost of construction for the Phase II building.

After Phase I was completed but before the Taking Action was commenced, the Developer recorded a Declaration of Condominium (Declaration) for the property pursuant to the North Carolina Condominium Act, N.C.G.S. § 47C-2-101 (2023), which legally established the Association on 13 July 2009. The Declaration transferred ownership of the property to the Association but, in this case, gave the Developer control over the Association and reserved the Developer's right "[t]o complete, within five years of the date of recordation of this Declaration of Condominium, any and all improvements indicated on the plats and plans up to a maximum of 140 Units." The Developer recorded multiple amendments to the Declaration, ultimately recording the Fifth Amendment on 8 March 2013. The Fifth Amendment, provided for, *inter alia*, transferring control of the Association from the

Developer to the unit owners and extending the Developer's right to complete Phase II until 13 July 2017. The Fifth Amendment stated that the amendment was agreed to by the Developer and at least sixty-seven percent of the unit owners; the Fifth Amendment was recorded on 8 March 2013.

On 27 July 2015, when the DOT initiated the taking, the Developer had not begun construction of the Phase II building and the taking prevented the construction of the Phase II building until after the DOT returned the property. At the time of the taking, the DOT anticipated keeping the temporary construction easement beyond 13 July 2017, the date when the Developer's rights to develop Phase II expired under the Fifth Amendment. The DOT ultimately terminated the temporary easement and returned control of the land to the Developer and the Association on 13 September 2017. When the DOT returned the property, the Developer's right to construct Phase II under the Fifth Amendment had expired.

The DOT initiated the Taking Action by filing a declaration of taking with an estimate of the just compensation for the taking and deposited the sum of $779,050 with the clerk of court as required by N.C.G.S. § 136-103. The DOT's filings referenced the Declaration and all five amendments as liens and encumbrances applicable to the property. The Developer and the Association jointly filed a responsive pleading arguing that the amount was grossly insufficient. This joint responsive pleading did not indicate any dispute over the validity of the Fifth Amendment or how the compensation would be apportioned between the parties.

After mediation in June of 2017, the DOT, the Developer, and the Association entered a consent judgment establishing that $3,950,000 was just compensation for the entire taking. The consent judgment did not establish how the just compensation would be divided between the Developer and the Association. Once the DOT deposited the full sum with the clerk of court, the DOT's involvement in the litigation ended.

During the pendency of the Taking Action, the Developer and the Association each filed a complaint against the other party regarding rights to the property. In the first of the related lawsuits the Developer filed a complaint against the Association seeking, *inter alia*, equitable reformation of the Fifth Amendment to allow the Developer additional time to develop Phase II of the property (Developer's Action). The Association responded to this claim asserting, among other things, that "the time limit expired within which development rights shall have been exercised pursuant to the Declaration and North Carolina law, and the time limit cannot be extended as a matter of North Carolina Law." The Association filed a separate complaint against the Developer shortly thereafter alleging twelve causes of action including, *inter alia*, a request for declaratory judgment to determine the Developer's rights to develop Phase II (Association's Action).

In the Developer's Action, the Developer and the Association litigated the validity of the Fifth Amendment in a hearing held on 28 August 2017. The trial court in that action granted partial summary judgment in favor of the Developer by finding

the one-year statute of limitations in N.C.G.S. § 47C-2-117(b) barred the Association from challenging the validity of the Fifth Amendment. The trial court concluded the Fifth Amendment was valid and the "parties [were] bound by the rights and obligations contained therein." Because the Fifth Amendment was valid, the Developer held the right to construct the Phase II building. In other words, at the time the DOT took control of the property, the Developer held valid rights even though those rights had expired by the time of the return of the property under the temporary easement.

Subsequently, the Developer filed a motion for a N.C.G.S. § 136-108 hearing in the Taking Action. In that motion, the Developer contended the parties were bound by the trial court's ruling in the Developer's Action, and the Fifth Amendment controlled distribution of the compensation. The trial court in the Taking Action held a hearing in April 2018 and entered an order concluding that the Association was precluded from relitigating the validity of the Fifth Amendment. Determining that estoppel principles required that the ruling in the Developer's Action bound the court in the Taking Action, the trial court held that the Fifth Amendment was valid and that, as of the time of the taking, the Developer held a valid right to develop Phase II. Subsequently, on 13 November 2019, the Association moved to stay the distribution of the funds pending resolution of the other claims, which would allow the Association the right to appeal the validity of the Fifth Amendment. Additionally, the Association requested consolidation of the claims. The trial court denied the motion to stay the

matter on 31 December 2019.

After the N.C.G.S. § 136-108 hearing in April of 2018, the Developer and the Association commissioned appraisals to provide opinions on the appropriate apportionment of the settlement. After the appraisals were complete, the Developer moved for summary judgment on 13 July 2020, requesting distribution of the taking compensation according to its appraisal. The Association, referencing the interplay between the claims, again asked the trial court to stay the action and to consolidate the claims. The Association argued that if, on appeal in the Developer's Action, the Fifth Amendment was found to be invalid, the conclusions of the appraisers would be invalid. The Developer argued that the appraisers agreed—albeit, premised upon the validity of the Fifth Amendment—that the majority of the value of the property taken resided in the development rights. If the Fifth Amendment was not valid, the appraisers for the Association reported that the compensation for the taking should be paid entirely to the Association. After a hearing on 22 July 2020, the trial court granted the motion for summary judgment in favor of the Developer pursuant to the valuation of property rights provided by the Association's appraiser, not the valuation set by the Developer's appraiser.[1] The trial court also consolidated all three actions. The Association filed a motion to amend the summary judgment order and requested the trial court's reconsideration. After a hearing on this motion, the trial court

---

[1] Again, the Developer does not contest on appeal the use of the Association's appraisal.

amended the order by decoupling the Taking Action from the other two actions but otherwise left the order untouched.

The trial court in the Taking Action ultimately entered an order and final judgment concluding that the loss to the Developer from the taking, based upon the Association's appraisal, was $3,350,000 and the remainder of the compensation should be assigned to the Association. The trial court found that under N.C.G.S. § 47C-1-107, the Developer must be fully compensated for the loss of the development rights first and any remaining funds should be distributed to the Association. *See* N.C.G.S. § 47C-1-107 (2023). After adjusting the settlement amount based on prejudgment interest, attorneys' fees, and property taxes, the trial court ordered that $2,929,225 be distributed to the Developer and $54,410 to the Association. The settlement funds were distributed to the parties pursuant to this order.

## B. Procedural Background

On appeal, a unanimous panel of the Court of Appeals held that the Developer was not entitled to summary judgment and distribution of settlement funds. *Dep't of Transp. v. Bloomsbury Ests., LLC*, 281 N.C. App. 660, 669 (2022). The Court of Appeals held that the issues presented in the Developer's Action and the Association's Action represented material facts affecting the apportionment of the settlement funds between the Developer and the Association in the Taking Action. *Id.* at 667–68. Additionally, the Court of Appeals held that because the valuation involves the opinion of appraisers, a jury should determine the credibility of each appraiser. *Id.*

at 668. The Court of Appeals affirmed the trial court's order regarding the consolidation of the actions but reversed the trial court's summary judgment order and remanded for further proceedings. The Developer filed a petition for discretionary review, and we allowed it.

## II. Analysis

The key issue in this case is whether the trial court appropriately resolved, under its authority pursuant to N.C.G.S. §§ 136-108 and -117, the interests in the taken property and the allocation of the just compensation settled in the consent judgment, such that summary judgment and distribution of just compensation was proper. The Developer argues that the validity of the Fifth Amendment was the only issue that affected the rights to the property on the date of the taking and, therefore, summary judgment and the distribution of compensation was appropriate before the resolution of the other claims. The Developer argues, that to the extent that the Association contends that any issues in the other actions affect the value of the property on the date of the taking, the Association had a duty to present those issues at the N.C.G.S. § 136-108 hearing. The Association provides multiple reasons that the other actions must be resolved before the compensation is distributed. However, at the core of its arguments is the correct but ultimately ancillary argument that the Developer should not be allowed to "double dip" by recouping essentially all of the just compensation for the loss of its development rights and then also seek to equitably reform the Fifth Amendment to restore and extend its development rights

after the taking. Recognizing the inequity in the Developer's position, we nonetheless hold, after consideration of the record and the other claims in the matter at hand, that the trial court properly granted summary judgment in favor of the Developer after resolving all issues presented for resolution at the N.C.G.S. § 136-108 hearing, and we trust a later trial court to weigh the Developer's future development rights in equity.

Fundamental to the "right to take private property for public use" is the requirement to pay "fair compensation for the property." *Town of Morganton v. Hutton & Bourbonnais Co.,* 251 N.C. 531, 533 (1960). When the public entity only takes a portion of the property, "just compensation consists of the difference between the fair market value of the entire tract immediately before the taking . . . and the fair market value of the land remaining immediately after the taking." *Dep't of Transp. v. M.M. Fowler, Inc.,* 361 N.C. 1, 5 (2006). In a similar vein, when the property taken has been approved for development, the value of those development rights affects the value of the taken property. *See Town of Midland v. Wayne*, 368 N.C. 55, 66 (2015) (recognizing that approved development rights are "an important feature of the condemned land" affecting the measure of damages).

Typically a judge or jury determines the value of the property in an eminent domain action. N.C.G.S. § 136-112 (2023). In this case, the value of the property was agreed upon in a consent judgment. The controversy at hand centers on the validity of the Fifth Amendment—an issue answering the question of which party held the

development rights to the property when the DOT instituted the Taking Action—outside of this action. Importantly, while the Developer's Action is an action collateral to the Taking Action, the legal question in that matter was resolved prior to the N.C.G.S. § 136-108 hearing.

Principles of res judicata preclude "a second suit based on the same cause of action between the same parties." *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 413 (1996) (cleaned up). The resolution of the Fifth Amendment's validity in the Developer's Action led the trial court in this matter to hold that validity of the Fifth Amendment could not be relitigated in this action. However, the trial court in the Developer's Action has not yet decided whether the Fifth Amendment can be equitably reformed to allow the Developer to develop the property after the taking was justly compensated and when the temporary easement ended. The resolution of the equitable reformation issue could affect which party held the development rights when the condemned land was returned to the parties. Instead, the trial court in the Taking Action—assuming no equitable reformation—held that the Developer lost development rights due to the taking and distributed compensation for the loss of those rights to the Developer. Plainly, to the extent the Developer wishes to press the undecided equitable reformation issue in a collateral action, the fact that the Developer has already been fully compensated for the loss of the development rights in the Taking Action would be a relevant consideration in equity. *See Surratt v. Chas. E. Lambeth Ins. Agency*, 244 N.C. 121, 131 (1956) (recognizing that when there are

-13-

inconsistent rights or remedies of which a party may avail himself, a choice of one is held to be an election not to pursue the other).

Because the trial court resolved all issues related to the interests in the property and the just compensation was settled in a consent judgment, we hold that the trial court properly granted summary judgment in favor of the Developer in the Taking Action.

## A.  Eminent Domain Actions Generally

"The right to take private property for public use, the power of eminent domain, is one of the prerogatives of a sovereign state. . . . Its exercise, however, is limited by the constitutional requirements of due process and payment of just compensation for property condemned." *State v. Core Banks Club Props., Inc.*, 275 N.C. 328, 334 (1969). Both the U.S. Constitution and the North Carolina Constitution require due process and just compensation when a public entity uses its eminent domain power to take property.  U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."); N.C. Const. art. I, § 19 ("[N]o person shall be . . . deprived of his . . . property, but by the law of the land.").

The General Assembly vested in the DOT the power of eminent domain and provided procedures for exercising this power in N.C.G.S. §§ 136-103 to -121.1.  *See* N.C.G.S. § 136-19(a) (2023) ("The Department of Transportation is vested with the power to acquire either in the nature of an appropriate easement or in fee simple such rights-of-way and title to such land . . . as it may deem necessary and suitable . . . to

enable it to properly prosecute the work, by purchase, donation, or condemnation, in the manner hereinafter set out."). When the DOT exercises its eminent domain power, it must provide just compensation to the "person owning said property or any compensable interest therein at the time of the filing of the complaint." N.C.G.S. § 136-104 (2023). Just compensation is defined as "the market value of property *at the time of the taking*, unaffected by any subsequent change in the condition of the property." *W. Carolina Power Co. v. Hayes*, 193 N.C. 104, 107 (1927) (cleaned up) (emphasis added).

When a partial tract of land is taken, the measure of damages, or just compensation, "shall be the difference between the fair market value of the entire tract immediately prior to said taking and the fair market value of the remainder immediately after said taking, with consideration being given to any special or general benefits resulting from the utilization of the part taken for highway purposes." N.C.G.S. § 136-112(1) (2023); *see also Barnes v. N.C. State Highway Comm'n*, 250 N.C. 378, 387 (1959) ("In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be, what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted—that is to say, what is it worth from its availability for valuable uses?" (quoting *Carolina-Tennessee Power Co. v. Hiawassee River Power Co.*, 186 N.C. 179, 183–84 (1923)).

In a DOT condemnation action, the General Assembly created a process for resolving questions related to the title of the land taken, interest in the land, proper parties, and all issues other than damages in N.C.G.S. § 136-108. The statute provides for a hearing to "eliminate from the jury trial any question as to what land [the State] is condemning and any question as to its title." *N.C. State Highway Comm'n v. Nuckles*, 271 N.C. 1, 14 (1967). The statute provides the following:

> After the filing of the plat, the judge, upon motion and 10 days' notice by either the Department of Transportation or the owner, shall, either in or out of term, hear and determine any and all issues raised by the pleadings other than the issue of damages, including, but not limited to, if controverted, questions of necessary and proper parties, title to the land, interest taken, and area taken.

N.C.G.S. § 136-108. It is the responsibility of the parties to argue all issues of which they are aware at the N.C.G.S. § 136-108 hearing. *See City of Wilson v. Batten Fam., L.L.C.*, 226 N.C. App. 434, 439 (2013) ("[A]t a minimum, a party must argue all issues of which it is aware, or reasonably should be aware, in a N.C.G.S. § 136-108 hearing.").

After the trial court resolves any issues related to the title of or interests in the property that was taken, then, under N.C.G.S. § 136-117, the trial court may determine how the settlement should be distributed:

> If there are adverse and conflicting claimants to the deposit made into the court by the Department of Transportation or the additional amount determined as just compensation, on which final judgment is entered in said action, the judge may direct the full amount

> determined to be paid into said court by the Department of Transportation and may retain said cause for determination of who is entitled to said moneys and may by further order in the cause direct to whom the same shall be paid and *may in its discretion order a reference to ascertain the facts on which such determination and order are to be made.*

N.C.G.S. § 136-117 (2023) (emphasis added). Generally, when there are conflicting claims as to how the compensation for the property taken by eminent domain should be apportioned, "a proper method of fixing the value of, or damage to, each interest or estate, is to determine the value of, or damage to, the property as a whole, and then to apportion the same among the several owners according to their respective interests or estates." *Barnes v. N.C. State Highway Comm'n*, 257 N.C. 507, 520 (1962).

With this general framework for an eminent domain action in mind, we now turn to the process employed in this case.

**B. Resolution of this Eminent Domain Action**

Initially, the Developer and the Association jointly argued that the DOT's estimated compensation, which did not include any value for development rights, was "grossly inadequate." A party's development rights in property, this Court has held, is an interest affected by condemnation of the property, and the right of development enhances the value of the property before the taking. *See Wayne*, 368 N.C. at 56 (holding that owners of an undeveloped portion of a subdivision had vested rights to complete the subdivision and the vested rights enhanced the value of the property

before the taking). Although the DOT originally valued the land, including damages caused by the temporary taking, at $779,050, the Developer, the Association, and the DOT agreed after mediation that the just compensation "for any and all claims for interests and costs; for any and all damages . . . ; and for the past and future use" was $3,950,000.

The Developer and the Association signed the consent judgment agreeing to the total valuation without agreeing between themselves on the apportionment of this compensation. The consent judgment which the Developer and the Association signed indicated that "the title to the property is not in dispute" and is "subject only to such liens and encumbrances as were set forth in Exhibit 'A' of the [c]omplaint and [d]eclaration of [t]aking." Exhibit "A" referenced the Declaration and all five amendments to the Declaration.

After the entry of this consent judgment, but before any N.C.G.S. § 136-108 hearing in the Taking Action, the Developer filed a collateral action seeking a declaratory judgment that the Developer "retains the right to develop Phase II until [13 July 2017], pursuant to the Fifth Amendment," and requesting reformation of the Fifth Amendment "to extend the time for [the Developer] to develop Phase II for a period of time equal to the time that the . . . DOT made it impossible for [the Developer] to do so." The Association filed a separate collateral complaint which alleged, *inter alia*, that "[t]he Fifth Amendment was not approved with unanimous consent of the unit owners." The Association did not notice the N.C.G.S. § 136-108

hearing prior to the resolution of the validity of the Fifth Amendment in the Developer's Action, although it could have. The trial court, in the Developer's action, held the Fifth Amendment was valid, establishing that the Developer held development rights at the time of the taking and those rights expired during the time that the DOT controlled a temporary easement on the property. The Association appealed that ruling to the Court of Appeals but then voluntarily withdrew the appeal on 5 January 2018. *Bloomsbury Ests., LLC*, 281 N.C. App. at 664. The Developer then asked the trial court in this action to adopt that ruling, asserting that the doctrine of collateral estoppel precluded the Association from relitigating the issue. *See generally Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 14–15 (2004) (acknowledging that issue preclusion estops a party from relitigating an issue in a later action after a final judgment has been entered on the merits in a prior judicial proceeding).

Even though the order finding the Fifth Amendment valid in the Developer's Action was an interlocutory order, the trial court in the Taking Action concluded that the "issue of the validity of the Fifth Amendment was fully litigated in [the Developer's] [A]ction and the [Association] enjoyed a full and fair opportunity to litigate this issue." In a condemnation action, the purpose of the N.C.G.S. § 136-108 hearing is to eliminate "any question as to what land the [DOT] is condemning and any question as to its title." *Nuckles*, 271 N.C. at 14; *see, e.g., DeHart v. N.C. Dep't. of Transp.*, 195 N.C. App. 417, 421–22 (2009) (resolving in the N.C.G.S. § 136-108

hearing an issue of whether a taking occurred). After the N.C.G.S. § 136-108 hearing, the trial court concluded that the "issue of the validity of the Fifth Amendment was a necessary ruling in [the Developer's Action] and therefore, the Fifth Amendment "is valid, and the parties are bound by the rights and obligations contained therein."[2]

However, neither the Developer nor the Association requested that the trial court address the issue of equitable reformation of the Fifth Amendment at the N.C.G.S. § 136-108 hearing. The Developer argued that such a request would not have been appropriate because any equitable reformation would not affect the value of the property on the date of the taking, thus making any determination of equitable reformation outside the scope of a N.C.G.S. § 136-108 hearing. However, with a temporary construction easement, the total loss due to the taking is affected by the value or condition of the property when it is returned to the owner. If the right to develop the property existed when the DOT took the land and was extinguished before the DOT returned the property, then the damages associated with the taking include the loss of those rights. *See Williams v. State Highway Comm'n*, 252 N.C. 514, 517 (1960) (recognizing that in calculating damages, "all of the capabilities of the property, and all of the uses to which it may be applied, or for which it is adapted,

---

[2] The Association appealed this ruling to the Court of Appeals. The Court of Appeals dismissed the appeal as interlocutory since the Association "failed to meet its burden in its principal brief to show why it affects a substantial right or to demonstrate what substantial rights would be jeopardized absent immediate review by this Court." *Dep't of Transp. v. Bloomsbury Ests.*, *LLC*, No. COA18-773, slip op. at 15–16 (N.C. Ct. App. Mar. 5, 2019) (unpublished). That decision was not appealed to this Court.

which affect its value in the market are to be considered, and not merely the condition it is in at the time and the use to which it is then applied by the owner" (cleaned up)). While we do recognize that the Developer was fully compensated for the loss of its development rights, we decline the Association's invitation to rule in this case on the equities of equitable reformation—such a determination was outside the scope of the N.C.G.S. § 136-108 hearing, and a trial court will undoubtedly weigh the equities taking into account this decision.

The legislature created this process "to eliminate from the jury trial any question as to what land the [DOT] is condemning," *Dep't of Transp. v. Rowe,* 351 N.C. 172, 175–76 (1999) (quoting *Nuckles*, 271 N.C. at 14), and "title to the land, interest taken, and area taken," N.C.G.S. § 136-108. Principles of res judicata apply to matters that have been fully litigated. *See Gibbs v. Higgins*, 215 N.C. 201, 204–05 (1939) ("The plea of *res* [ ]*judicata* applies, except in special cases, not only to the points upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject in litigation and which the parties, exercising reasonable diligence, might have brought forward at the time and determined respecting it." (cleaned up)).

Because the parties in the Developer's Action litigated the validity of the Fifth Amendment, we conclude the trial court in this Taking Action did not err in concluding that the Fifth Amendment was valid, and the parties were bound by the rights and obligations of the Fifth Amendment.

## C. Summary Judgment

At the conclusion of the N.C.G.S. § 136-108 hearing, all issues except how the compensation would be apportioned were resolved. Both parties previously agreed—by consent order—that the total damages for the taking were $3,950,000. The sole remaining issue was the appropriation of the compensation between the parties. In eminent domain proceedings, N.C.G.S. § 136-117 gives the trial court the discretion to "order a reference"—in this case, appraisals— "to ascertain the facts" as to "who is entitled to said moneys." N.C.G.S. § 136-117; *cf. Va. Elec. & Power Co. v. Tillett*, 316 N.C. 73, 77–78 (1986) (highlighting that the Rules of Civil Procedure are applicable in eminent domain proceedings to the extent that the rules do not conflict with procedures identified in the eminent domain statutes).

We review summary judgment de novo. *Forbis v. Neal*, 361 N.C. 519, 524 (2007). Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573 (2008) (quoting *Forbis*, 361 N.C. at 523–24). "An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Dalton v. Camp*, 353 N.C. 647, 651 (2001).

At summary judgment, the appraisers for the Developer and the Association agreed that because the Fifth Amendment was valid, the Developer should be fully compensated for the development rights, which—according to the Association's appraisal—were worth $3,350,000. The Association's appraisal "determined the loss to the [Developer] as a result of the partial taking, as of the date of the taking was $3,350,000 . . . and thus the remainder of the recovery ($600,000) should be assigned to the Association." At the time of the summary judgment hearing, only $3,055,102 of the compensation remained due to disbursements for attorneys' fees and costs. The Association argued that there were material issues of fact precluding an entry of summary judgment, i.e., whether the Association owned the property and the development rights and the proper allocation of the eminent domain proceeds. The trial court granted summary judgment and apportioned the remaining funds between the parties based upon percentages from the Association's appraisal. Because the Fifth Amendment was found to be valid and because the appraisers agreed—based upon the validity of the Fifth Amendment—that the Developer was entitled to compensation for loss of the development rights, there was no dispute of material facts. Therefore, the trial court did not err in granting summary judgment in favor of the Developer. Further the trial court did not err in exercising its discretion under N.C.G.S. § 136-117 to distribute the funds in a manner that compensated the Developer for the loss of the development right and distributed the residual funds to the Association.

The Court of Appeals held that summary judgment was not proper, and that "a jury should be allowed to determine the credibility of each appraiser and examine their opinions of value." *Bloomsbury Ests., LLC*, 281 N.C. App. at 668. However, the Court of Appeals did not address the fact that the appraisers agreed that the Developer should be compensated for the loss of the development rights. Additionally, the plain language of N.C.G.S. § 136-117 allows the trial court the discretion to order an appraisal that the trial court can use to determine the apportionment of the compensation. *See* N.C.G.S. § 136-117; *see also State Highway Comm'n v. Cape,* 49 N.C. App. 137, 140–41 (1980) (noting in the context of an eminent domain proceeding related to multiple tracts of land that when the total compensation is apportioned between distinct tracts of land, the trial court can apportion the damages among several owners of a single tract according to their respective interests and estates). The reference ordered by the trial court—the appraisals—along with the Developer's concession to use of the Association's appraisal established no dispute that the Developer was entitled to the compensation associated with the loss of development rights. The trial court adopted the Association's appraisal for the value of those rights as allowed by N.C.G.S. § 136-117. The Court of Appeals erred in concluding that the trial court did not have the authority to do so.

### III.    Conclusion

In sum, the trial court in the Taking Action appropriately granted summary judgment after resolving all issues pleaded and argued at the N.C.G.S. § 136-108 hearing related to title and the interests taken as of the date of the taking. Accordingly, we reverse the decision of the Court of Appeals.

REVERSED.